### In re OWEN McCAFFREY'S SONS.

### In re MESICK & MESICK et al.

Circuit Court of Appeals, Second Circuit.
July 19, 1927.

No. 338.

Towage ⟺11(9)—Tug held not at fault for loss of tow going ashore during storm.

Tug *held* not at fault for loss of tow, consisting of six loaded coal barges, when hawsers parted and tow went ashore during severe storm.

Appeal from the District Court of the United States for the Southern District of New York.

Petition for limitation of liability by Owen McCaffrey's Sons, owners of the tug Bully, wherein Mesick & Mesick and others filed claims. From a decree limiting liability, but holding the tug liable, petitioner appeals. Decree reversed, and cause remanded, with instructions.

Appeal from a decree holding the tug Bully at fault for the loss of her tow in a storm. The appellant, owner of the Bully, petitioned to limit her liability, and the owners of the tow filed claims. The District Court granted the petition to limit, but held the tug at fault and awarded damages out of the stipulation.

On December 12, 1917, the Bully, with six loaded coal barges in tow, two in each tier, was bound east in Long Island Sound and early in the morning found herself in threatening weather off Norwalk Harbor. She turned back, went into the harbor, and slipped her starboard anchor, making it fast to the starboard hawser barge, the Tatnall. The wind was fresh from the northeast, and was about dead ahead, as the harbor, which is long and narrow, lies in a general northeast and southwest direction. Here the flotilla lay in security throughout the 12th, and at noon on the 13th the tug went to Norwalk for fresh water. The tug's master, there hearing that a storm was brewing, came back at 3 p. m., and made fast on the starboard hand of the Tatnall. At 6 p. m., the weather getting bad, the anchor cable was changed from the barge to the tug, the tow was allowed to drift behind upon a new wire ⅞-inch hawser with a bridle, one end of which led to each of the two barges in the first tier. As the storm increased, the anchor began to drag and the Bully set her engines at full speed ahead, and slipped her port anchor. At about 10 p. m., on the flood tide, which made west, and in a severe gale, the bridle parted. The Bully weighed both anchors, backed to the tow, made fast to it with two 7½-inch hempen hawsers, one leading to each of the barges in the first tier, and again slipped both anchors. Later, first the starboard hawser parted, then the port, and the tow went ashore, causing the loss complained of.

The faults charged against the Bully were her failure to make for a more sheltered refuge, the insufficiency of her anchor, her failure to direct the barges to anchor, the fouling of her hawsers on her wheel, and the incompetence of her crew. The judge held that the tug had no other alternative than to anchor where she did, but that she should have slipped her port anchor at once, and should have determined "what should be done about the anchors on the tows." For these reasons he condemned the tug.

Park, Mattison & Lynch, Samuel Park, and Anthony V. Lynch, Jr., all of New York City, for the Bully.

Macklin, Brown, Lenehan & Speer and Horace L. Cheyney, all of New York City, for certain claimants.

Blodgett, Jones, Burnham & Bingham and Albert T. Gould, all of Boston, Mass., for other claimants.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

L. HAND, Circuit Judge. The claimants upon this appeal do not challenge the finding of the District Court that the Bully could only have ridden out the storm where she lay. They had contended that she should have made for Wilson's Point, but there was ample evidence to justify the judge's conclusion that this would not have been a safe berth, and

we should not be disposed to disturb his finding, even if the point were still pressed.

There remains only the conduct of the tug after the storm broke on the evening of the 13th. The failure to slip the port anchor along with the starboard could not possibly have had anything to do with the disaster, assuming that more cautious seamanship required it. The claimants' theory is that the tow had already begun to drag when the port anchor was slipped, and that, had this been done earlier, the tug might have held it. If the tow had dragged ashore, there might be plausibility in this, but it did not. The bridle parted while the tug was dragging, and this was the first mishap. Yet it is plain that the strain on the bridle would have been greater, had the anchors held than if the whole flotilla dragged. Again, when the Bully made fast a second time with the hempen hawsers, she already had her two anchors down. We have no reason to assume at that time that she was dragging. At any rate it was once more the hawsers which parted, and the tow finally broke loose for this reason. It is possible, of course, that, had the hawsers held, the tow would still have gone ashore, but that is the merest speculation, and in any event it is impossible to hold the tug for what might have been the consequence of her delay in slipping the port anchor, when the loss in fact happened through the parting of the hawsers. We can see no fault in all this, the hawsers being sound.

Finally, it was a question of judgment whether to tell the barges to slip their anchors or not. A proper lead of cable would, or might, have brought the anchors of the hawser tier under the tug, and similarly, if the lines between the tiers had in fact been lengthened (which is disputed), the cables or anchors of each tier probably would have fouled the tier ahead. If they were not lengthened, it was impossible to slip any anchors but those on the first tier. There was a substantial sea on, in which the tug and her tow were jumping; there was little water to spare beneath them. We cannot say that good seamanship demanded the slipping of the barges' anchors even of the first tier. Any vessel impaled upon one of the flukes was certain to be lost, and if this had happened to the tug, the whole flotilla would go. We are in no position to say which course was the wiser; if we were to guess, we should approve the master's decision.

None of the other faults alleged are pressed or proved, and we cannot find any fault with which to charge the tug. The storm was exceedingly severe, though by no means unheard of, and while it is true that the tug learned of its approach, we do not see what more she could do than she did.

Decree reversed, and cause remanded, with instructions to grant the petition, not only for limitation, but for freedom from liability.